LAURIE MARSHALL

VERSUS

TRAVIS THURMAN

NO. 25-CA-309

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 854-224, DIVISION "M"
HONORABLE SHAYNA BEEVERS MORVANT, JUDGE PRESIDING

September 24, 2025

**SUSAN M. CHEHARDY**
**CHIEF JUDGE**

Panel composed of Judges Susan M. Chehardy,
Stephen J. Windhorst, and E. Adrian Adams, Pro Tempore

**JUDGMENT AFFIRMED; REMANDED WITH INSTRUCTIONS**
 **SMC**
 **SJW**
 **EAA**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Waquin
Deputy, Clerk of Court

COUNSEL FOR DEFENDANT/APPELLANT,
TRAVIS THURMAN
Cynthia A. De Luca
Marynell L. Piglia
Julius C. Ford

COUNSEL FOR PLAINTIFF/APPELLEE,
LAURIE MARSHALL
Christine F. Remy

**CHEHARDY, C.J.**

The trial court entered a judgment on February 26, 2025, and pursuant to the Post-Separation Family Violence Relief Act, awarded sole custody of the minor child, R.T., to his mother, Laurie Marshall, and supervised visitation to the child's father, Travis Thurman. Mr. Thurman seeks expedited review of the judgment. Ms. Marshall has answered the appeal to request attorney's fees and costs. For the reasons set forth below, we affirm the trial court's judgment and remand for a determination of attorney's fees and costs pursuant to La. R.S. 9:367.

**PROCEDURAL HISTORY**

Laurie Marshall and Travis Thurman are the parents of the minor child, R.T. (born 04/28/23).[1] The parties were never married, but were cohabitating when the child was born. This domestic matter commenced with the filing of a Petition to Establish Paternity, Filiation, and to Set Custody by Ms. Marshall on May 14, 2024. On May 29, 2024, as a result of an incident that occurred on May 10, 2024, where Mr. Thurman became enraged at Ms. Marshall, verbally assaulted and physically threatened her while R.T. was sitting on her lap, Ms. Marshall filed a Supplemental and Amending Petition. In her supplemental petition, Ms. Marshall requested sole custody and supervised visitation of the minor child, alleging that Mr. Thurman's unsupervised physical custody of R.T. potentially posed a substantial risk of harm to the minor child. Ms. Marshall further requested all other general and equitable relief to which she may be entitled.[2]

On July 15, 2024, following a Hearing Officer Conference, an Interim Judgment with the hearing officer's recommendations was submitted regarding

---

[1]    The initials of the minor child (and the initials of other minor children mentioned *infra* in this opinion) are used to protect and maintain the privacy of the minor child(ren) involved in this proceeding. *See* Uniform Rules–Courts of Appeal, Rule 5–1.

[2]    After receiving personal service of Ms. Marshall's original petition to establish paternity, on June 6, 2024, Mr. Thurman filed an almost identical suit in St. Bernard Parish against Ms. Marshall entitled, Petition to Establish Paternity and Rule for Child Custody. Despite numerous efforts by Mr. Thurman to have the matter tried in St. Bernard Parish, the matter proceeded in Jefferson Parish.

DNA testing, physical custody, and communication.  On July 19, 2024, Mr. Thurman filed an objection to the hearing officer's recommendations and interim order.

After several continuances, on October 30, 2024, the hearing officer conducted a conference regarding several issues, including Ms. Marshall's original and supplemental Petitions to Establish Paternity, Filiation, and for Sole Custody, Motion for Domiciliary Parent, and Motion to Set Supervised Visitation.  An Interim Judgment from the October 30, 2024 hearing officer conference was signed by the trial court, wherein Mr. Thurman was determined to be the natural and biological father of R.T., the parties were awarded joint custody of R.T., Ms. Marshall was designated the domiciliary parent, Mr. Thurman was granted unsupervised physical custody, and child support was established.

On November 6, 2024, Mr. Thurman filed an objection to the hearing officer's recommendations and to the interim order regarding child custody and child support, objecting to (1) Ms. Marshall being named domiciliary parent, because he "believes that Ms. Marshall has a history of alienating the minor child from Mr. Thurman and has made major decisions for the minor child without consulting" him; (2) the child support obligation; and (3) having to pay childcare expenses while R.T. was in his custody.  Mr. Thurman filed a memorandum in support of his objections on November 14, 2024.  In response, on December 4, 2024, Ms. Marshall filed an opposition to Mr. Thurman's objections.

Similarly, on November 7, 2024, Ms. Marshall also filed an objection to the hearing officer's recommendations, objecting to (1) the physical custody schedule; (2) child support and related expenses; and (3) the physical exchange location for the minor child.  Ms. Marshall filed a memorandum in support of her objections on November 14, 2024, asserting that the recommended custody schedule was not feasible nor in the best interest of the minor child.  In her memorandum, Ms.

Marshall described the incident that occurred on May 10, 2024, when she and R.T. "moved out/were evicted" from the home where they were living with Mr. Thurman because he was severely verbally abusive towards her and the minor child. At that time, Ms. Marshall and the minor child moved in with her mother in Jefferson Parish and changed their domicile and residence to Jefferson Parish.

On February 20, 2025, the parties' respective objections to the hearing officer's October 30, 2024 recommendations and the interim judgment came for a hearing before the trial court. By consent of the parties and their counsel, the child custody and child support issues were bifurcated, and the matter proceeded solely as to the issue of child custody. Both parties, and a number of witnesses, testified at the trial and presented evidence.

At the conclusion of the hearing, providing oral reasons, the trial court found that Mr. Thurman had perpetrated more than one incident of family violence on Ms. Marshall, constituting a history of family violence, triggering the application of the Post-Separation Family Violence Relief Act, La. R.S. 9:361 *et seq.* ("PSFVRA"). In accordance with the provisions of the Act, the trial court awarded sole custody of R.T. to Ms. Marshall, with Mr. Thurman to have supervised visitation on alternating weekends beginning on February 28, 2025. After ordering supervised visitation, the parties stipulated to Dr. Rafael Salcedo as the court-appointed supervisor, with the expenses of same to be borne by Mr. Thurman. The trial court specifically ordered that "[a]t no time shall supervised visitation be overnight or in the home of Mr. Thurman." The trial court further ordered that Mr. Thurman undergo a psychiatric evaluation to be performed by Dr. Jessica Boudreaux at his expense. Finally, the trial court ordered that Mr. Thurman must enroll in a court-ordered anger management class as well as a domestic abuse intervention program at 802 Second Street, Gretna, Louisiana, also at his expense. The trial court signed a judgment on February 26, 2025, in accordance with these

findings, and issued findings of fact and written reasons for judgment that same day.

In its written reasons for judgment, the trial court stated the following in regard to its findings of more than one act of family violence by Mr. Thurman triggering the PSFVRA, and as to the credibility of the parties:

> The first incident of abuse found by this court is the incident towards Ms. Marshall which was reported to the St. Bernard Sheriff's Office on September 3, 2023. Ms. Marshall testified she and Mr. Thurman came home from a concert and he forced himself into the bedroom where she was causing the door to become dismantled, he choked her, and he began punching the wall inside the bedroom. She attempted to leave, and he then grabbed her by the wrist. While Mr. Thurman denied this incident occurred as testified to by Ms. Marshall, the police report noted that [the officer] observed the door was off the hinges. Mr. Thurman admitted the parties argued with each other after they left the concert, and he punched the wall, but denied the other events as testified to by Ms. Marshall.
>
> Ms. Marshall's version of events is corroborated by the report introduced, in that the officer was able to observe the door off the hinges, and noted same. In considering the demeanor in testifying, the Court finds Ms. Marshall's version of the story to be credible, and supported by other evidence, and the facts in this case. The Court found Ms. Marshall also credible in why she changed her story from her initial call to police, who dispatched to a strangulation, to change due to her fear she and Mr. Thurman would go to jail, leaving no one to care for the children.
>
> [As to the second incident of family violence,] Ms. Marshall presented the reluctant testimony of Amber Aranda, a former dating partner of Mr. Thurman. Mr. Thurman and Ms. Aranda also have a child together. Ms. Aranda testified that while she was pregnant, Mr. Thurman choked her. She also testified that on another occasion [the third incident of family violence], Mr. Thurman pushed her into furniture. Ms. Aranda explained that it was after this second incident, she left the residence they shared together. Ms. Aranda also testified that the minor children heard the violence between [her] and Mr. Thurman.
>
> Ms. Aranda was clearly hesitant to testify before the Court, as she and Mr. Thurman enjoy a civil relationship

and co-parenting relationship in raising their child together. However, the trauma on her face, and the fear was evident to the Court in weighing her credibility and testimony.

It is the credible testimony of Ms. Marshall and Ms. Aranda, which provides for three separate instances of family violence, which triggers the application of the PSFVRA.

While the remaining facts are not controlling here, and were mostly excluded with a focus of addressing any finding of PSFVRA, there are other key pieces of evidence, which were considered, and support the Court's concern that the minor child, R.T., should be protected.

At trial, a video recording was introduced of Mr. Thurman screaming and cursing at Ms. Marshall in front of R.T. This Court finds explicit language and behavior exhibited in front of the parties' minor child was far worse than what was alluded to in the pleadings. [Ms. Marshall] also presented a video recording of Mr. Thurman screaming and cursing at his father while Ms. Marshall and the minor child were present in the house. Ms. Marshall went into another room because she was afraid. The Court is gravely concerned for the safety of Ms. Marshall and her son as evidenced by the manner in which Mr. Thurman spoke to her and his own father. This Court notes that even Mr. Thurman looked visibly uncomfortable with his own behavior during the presentation of these videos.

Specifically, this Court finds the testimony of Ms. Marshall to be credible especially in light of the video tape of Mr. Thurman's egregious verbal abuse towards her in the presence of the child, as well as another incident of his verbal abuse towards his father. Her demeanor on the stand was persuasive in both the communication of her fear for R.T. and her sincerity.

***

As to Mr. Thurman's testimony, this Court specifically finds his testimony was replete with him not being able to recall or he cannot remember whenever it was unfavorable to him or his case. His demeanor was problematic. Mr. Thurman made no eye contact with the Court and he constantly looked at his family or attorney before answering questions.

Another piece of evidence, which raises great concern for this Court are the a [sic] photographs depicting R.T.'s middle finger as the only finger allegedly burned by a hot

curling iron. Mr. Thurman testified R.T. hurt himself on accident. The Court is not convinced this was in fact an accident. The fact that Mr. Thurman failed to tell Ms. Marshall of the incident in that "he forgot" is a problem, as the injury was clearly enough to elicit a response from the child. Additionally, the reasoning defies logic and common sense; typically, children, of almost two years of age, do not go around touching things solely with their middle finger extended. The burn mark raises questions of possible abuse, or if the story is to be believed, neglect, in that a child of this age was able to access a hot curling iron.

The remaining witness testimony and evidence were not persuasive upon the Court for the reasons provided on the record at the conclusion of the hearing.

Based on the above, this Court was presented with sufficient testimony and evidence of family violence perpetrated by Mr. Thurman towards Ms. Marshall and Ms. Aranda triggering the application of the PSFVRA. This Court also finds persuasive the evidence showing Mr. Thurman's chronic history of family violence.

[Internal footnotes omitted.]

Mr. Thurman moved for an expedited appeal, raising numerous assignments of error. Ms. Marshall filed an answer to the appeal seeking attorney's fees and costs.

## ASSIGNMENTS OF ERROR

On appeal, Mr. Thurman presents four issues for this Court's review: (1) whether a child custody litigant's due process rights prevent an opposing litigant from presenting evidence of domestic violence, when the pleadings contain no allegations of domestic violence and the aggrieved litigant objects; (2) whether the trial court properly applied the PSFVRA in this case; (3) whether the numerous alleged evidentiary errors collectively amount to an abuse of the trial court's discretion; and (4) whether this Court should make its own independent, *de novo* review of the record and determine the case on its merits.

## DISCUSSION

### I.    *Standard of Review*

Each child custody case must be reviewed in light of its own particular set of facts and circumstances, with the paramount consideration being the best interest of the child.  La. C.C. art. 131; *Main v. Main*, 19-0503 (La. App. 5 Cir. 2/19/20), 292 So.3d 135, 142, *writ denied*, 20-545 (La. 6/12/20), 307 So.3d 1036.  It is the child's emotional, physical, material, and social well-being and health that are the court's very purpose in child custody cases, and the court must protect the child from the real possibility that the parents are engaged in a bitter, vengeful, and highly emotional conflict.  *C.M.J. v. L.M.C.*, 14-1119 (La. 10/15/14), 156 So.3d 16, 28.  The trial judge sits as a sort of fiduciary on behalf of the child, and must pursue actively that course of conduct which will be of the greatest benefit to the child.  *Id.* at 28-29; *Hodges v. Hodges*, 15-585 (La. 11/23/15), 181 So.3d 700, 702. The trial court is in the best position to ascertain the best interest of the child given the unique circumstances of the particular case.  *Tanwar v. Tanwar*, 25-142 (La. App. 5 Cir. 5/22/25), --- So.3d ---, 2025 WL 1466348, *9.  The legislature has mandated that the court look only to the child's best interests so that the court can fulfill its obligations to the child.  *Id.*

Appellate courts will not disturb a trial court's custody award absent manifest error or an abuse of discretion.  *Williamson v. Bell*, 24-6 (La. App. 5 Cir. 5/22/24), 389 So.3d 948, 956 (citing *Wilson v. Wilson*, 15-74 (La. App. 5 Cir. 4/29/15), 170 So.3d 340, 344).  The discretion afforded the trial court is because, in most custody cases, the trial court's rulings are based heavily on its factual findings.  *Id.*  Likewise, great weight is given to the trial court's determination in matters of visitation, and the court's judgment will not be overturned absent a clear abuse of discretion.  *Main*, 292 So.3d at 142.

We review the trial court's factual findings in a child custody determination for manifest error. *McCaffery v. McCaffery*, 13-692 (La. App. 5 Cir. 4/9/14), 140 So.3d 105, 115, *writ denied*, 14-981 (La. 6/13/14), 141 So.3d 273. However, in child custody and visitation matters, as in other areas of the law, "[t]he application of statutes is a question of law[,]" and "[a]n appellate court reviews questions of law *de novo* to determine whether the trial court was legally correct or incorrect." *Barak v. Saaks*, 21-756, 22-758, 22-759 (La. App. 4 Cir. 10/12/22), 367 So.3d 656, *writ denied*, 22-2734 (La. 1/11/23), 352 So.3d 987 (citing *Durand v. Rose*, 22-300 (La. App. 4 Cir. 9/15/22), 366 So.3d 484, 491). The trial court's other determinations are reviewed for an abuse of discretion. *Id.* The issue to be resolved by the reviewing court is not whether the trier of fact is right or wrong, but whether the factfinder's conclusion is a reasonable one. *Main*, 292 So.3d at 142. An appellate court may not reverse reasonable findings merely because it would have weighed the evidence differently. *Williamson*, 389 So.3d at 956.

In the area of domestic relations, much discretion is vested in the trial judge, particularly in evaluating the weight of the evidence, which is to be resolved primarily on the basis of the credibility of the witnesses. When findings of fact are based upon a decision of the credibility of witnesses, respect should be given to those conclusions, for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on understanding and believing what is said. *Rosell v. ESCO*, 549 So.2d 840 (La. 1989); *Dufresne v. Dufresne*, 08-215, 09-216 (La. App. 5 Cir. 9/16/08), 992 So.2d 579, 585, *writ denied*, 08-2843 (La. 12/17/08), 996 So.2d 1123; *Larremore v. Larremore*, 52,879 (La. App. 2 Cir. 9/25/19), 280 So.3d 1282, 1289.

## II. *Mr. Thurman's Due Process Rights*

Mr. Thurman argues on appeal that his due process rights were violated when the trial court abused its discretion by "expand[ing] the custody hearing

beyond those matters specifically plead[ed]" by Ms. Marshall, and allowing her to present a case of domestic violence "when no domestic violence was plead in any pleadings or memoranda." In support of his argument, Mr. Thurman cites numerous code articles and case law for the proposition that only under certain circumstances, may proof beyond the pleadings, even if object to, be admitted and considered when permission to amend the pleadings is requested and granted; otherwise, a judgment beyond the pleadings is a nullity. He argues that because Ms. Marshall neither sought permission to amend her pleadings, though she could have, nor was permission granted to do so, the fact finding process in this case was "so badly interdicted ... that this Honorable Court would be justified in conducting a *de novo* review of the record and rendering a custody decision . . . after determining which evidence should be admitted and weighing that evidence in light of the best interest of the child custody factors contained in La. C.C. art. 134."

Of the eight cases relied upon by Mr. Thurman, however, only *one* concerned a child custody case, which is clearly factually and legally distinguishable from the instant one. Specifically, he relies on *Huckabay v. Huckabay*, 24-501 (La. App. 3 Cir. 2/12/25), 405 So.3d 1148, wherein a default judgment awarding the mother sole custody, when she only prayed for an award of joint custody, was reversed on appeal pursuant to La. C.C.P. art. 1703, which provides that a default judgment may not be different in kind from that demanded in the petition. The remaining cases relied upon by Mr. Thurman have absolutely no bearing on the instant case. *See Domingue v. Boden*, 08-62 (La. App. 3 Cir. 11/5/08), 996 So.2d 654, 657 (involving spousal support only); *Romero v. State Farm Fire and Casualty Co.*, 479 So.2d 694 (La. App. 3 Cir. 1985) (a worker's compensation claim); *Guillory v. Buhler*, 398 So.2d 43 (La. App. 3 Cir. 1991) (a medical malpractice action); *Ussery v. Ussery*, 583 So.2d 833 (La. App. 3 Cir. 1991) (seeking child support only); *Brown v. RLC Trucking, Inc.*, 24-431 (La. App.

5 Cir. 9/20/24), 2024 WL 4249454 (involving a motor vehicle accident); *Miller v. Thibeaux*, 14-1107 (La. 1/28/15), 159 So.3d 426 (a wrongful death action); and *Udomeh v. Joseph*, 11-2839 (La. 10/26/12), 103 So.3d 343 (a wrongful death action).

In response, Ms. Marshall contends that neither the provisions of the PSFVRA nor the case law requires that relief under the Act be specifically pleaded, where the allegations of abuse have been raised in a pleading *or* tried by the express or implied consent of the parties. *Melancon v. Russell*, 18-48 (La. App. 5 Cir. 10/17/18), 258 So.3d 955, 960 (citing *Ledet v. Ledet*, 03-537 (La. App. 5 Cir. 10/8/03), 865 So.2d 762, 765; *Dufresne*, 992 So.2d at 585-86; *Nguyen v. Le*, 07-81 (La. App. 5 Cir. 5/15/07), 960 So.2d 261, 263.[3] Ms. Marshall also cites *Barlow v. Barlow*, 14-361 (La. App. 3 Cir. 10/1/14), 149 So.3d 856, 861, wherein the father argued on appeal that the trial court erred in awarding sole custody to the mother when she did not specifically request it. In rejecting the father's argument, the appellate court stated that the mother had, in fact, requested "any and all just and equitable relief," and further, based on the facts presented at the child custody trial, the trial court had the authority to award any relief warranted by the facts pursuant to La. C.C.P. art. 862.[4] *Barlow*, 149 So.3d at 861.

We find no merit to Mr. Thurman's argument that his due process rights were violated in this matter. A review of Ms. Thurman's Supplemental and Amending Petition to Establish Paternity, Filiation, and to Set Custody, filed on May 29, 2024, shows the following:

---

[3]     In *Nguyen*, this Court found that allegations of abuse under the PSFVRA cannot be raised for the first time on appeal, as it requires the trial court to make a specific determination of whether there has been a "history of family violence." In the instant matter, allegations of abuse were raised in the trial court and the trial court made a specific determination that there is a history of family violence.

[4]     La. C.C.P. art. 862 provides that,"[e]xcept as provided in Article 1703, a final judgment shall grant the relief to which the party in whose favor it is rendered and is entitled, even if the party has not demanded such relief in his pleadings and the latter contain no prayer for general and equitable relief."

5.

> Petitioner seeks sole custody of the minor child, [R.T.], born on April 28, 2023, subject to supervised visitation in favor of TRAVIS THURMAN. Petitioner believes that the minor child *is at substantial risk of harm in the unsupervised physical custody* of TRAVIS THURMAN. He has been *severely verbally abusive both to LAURIE MARSHALL and the minor child*. [Emphasis supplied.] **In front of the minor child**, he has screamed things such as "F\*\*k You, y'all can go" "F\*\*k yourself" "Get your shit and get the F\*\*k out" "You will always be a miserable Mother F\*\*ker" "You will always be a no good Mother F\*\*ker" and "You are all a bunch of Westbank F\*\*king Bitches." [Emphasis in original.]

Further, the petition requests that Ms. Marshall be granted "all other general and equitable relief to which [she] may be entitled." Based on these allegations, which were filed a full *seven-and-a-half months prior to trial*, we find that Mr. Thurman had sufficient notice and was fully aware that Ms. Marshall was seeking sole custody and supervised visitation based on allegations that he was abusive to both her and R.T.

Also, as previously stated, each child custody case must be reviewed in light of its own particular set of facts and circumstances, with the paramount consideration being the best interest of the child. La. C.C. art. 131; *Main*, 292 So.3d at 142. In determining the best interest of the child in cases involving a history of family violence, domestic abuse, including sexual abuse, **"whether or not a party has sought relief under any applicable law,"** the legislature has mandated that the trial court "determine an award of custody or visitation in accordance with La. R.S. 9:341 and La. R.S. 9:364." La. C.C. art. 134(B). [Emphasis added.] Thus, pursuant to La. C.C. art. 134(B), acts of abuse and violence by a party are always taken into account by the trial court when making determinations of child custody and visitation.

The record contains additional evidence clearly suggesting that Mr. Thurman was well aware that Ms. Marshall was seeking sole custody of R.T. and

supervised visitation, and that domestic abuse was going to be an issue at trial. For example, in his witness list, Mr. Thurman identified Breanna Goodling, a former girlfriend who had previously filed a petition for protection from abuse against him, as a witness who was to "testify about facts related to her interactions with Travis." Also in his witness list, Mr. Thurman named Lauren Crawford, who would "testify about facts related to incidents on videos and police reports about interactions between Travis and Laurie and Travis and [R.T.]."[5] In his exhibit list, Mr. Thurman identified a "[s]creenshot of Laurie Marshall messaging people asking if Travis abused them."

Further, prior to the commencement of trial, Mr. Thurman stated on the record, in pertinent part:

> Your Honor . . . they're seeking sole custody with supervised visitation, and they're saying that my client is a danger to these children and everyone around him. So, I plan to call people that have seen him interact with these children and who can testify to whether they've seen him yell at these children, whether they've seen him put his hands on these children and whether they've had any cause for concern . . .

Based on the foregoing, we find no merit to Mr. Thurman's contention that his due process rights were violated when the trial court allegedly "expanded the child custody hearing beyond the pleadings" by allowing Ms. Marshall to present a case of domestic violence "when no domestic violence was plead [sp] in any pleadings or memoranda."

## III. *The PSFVRA*

Mr. Thurman next argues the trial court erred by applying the PSFRVA to this case when it found only one violent incident had occurred between himself and Ms. Marshall, which did not result in serious bodily injury, and found no acts of violence committed by him against R.T. Mr. Thurman contends that the fact that

---

[5] Ultimately, Mr. Thurman did not call Ms. Crawford to testify as a witness at trial.

he exhibited violence or abused others is not germane to whether R.T. is at risk with him now.  Specifically, Mr. Thurman avers that the trial court's ruling ignores the mandatory language of La. R.S. 9:362(4) that defines family violence as that "committed '**by one parent against the other parent** or against any of the children.'"  [Emphasis in original.]  According to Mr. Thurman, the trial court could only consider the actions occurring between himself and Ms. Marshall for purposes of determining whether the PSFVRA was triggered, not prior actions that involved a third party and, because in this case the trial court found only one such "violent" act, which did not result in serious injury, the PSFVRA does not apply.  In particular, Mr. Thurman avers the trial court improperly considered the two acts of violence he perpetrated upon a former dating partner, Amanda Aranda (who is the mother of one of his other minor children), when it wrongfully concluded the PSFRVA was triggered in this case.  We disagree.

The PSFRVA, found in La. R.S. 9:361 *et seq.*, was created to protect victimized parties when domestic disputes arise in the course of separation and divorce.  *Melancon*, 258 So.3d at 959-60; *State ex rel. S.D.K.*, 04-218 (La. App. 5 Cir. 5/26/04), 875 So.2d 887, 890-91.  La. R.S. 9:364(A) creates a presumption against awarding sole or joint custody to a parent with a history of perpetrating family violence.  It further provides that "[t]he court may find a history of perpetrating family violence if the court finds that one incident of family violence has resulted in serious bodily injury or the court finds more than one incident of family violence."  La. R.S. 9:364(C).

La. R.S. 9:364(E) was specifically designed to protect a child's interest by restricting the rights of an abusing parent in families with a history of family violence.  *Melancon*, 258 So.3d at 960; *Michelli v. Michelli*, 93-2128 (La. App. 1 Cir. 5/5/95), 655 So.2d 1342, 1346.  La. R.S. 9:364(E) provides that "[i]f the court finds that a parent has a history or perpetrating family violence, the court shall

allow only supervised child visitation with that parent pursuant to La. R.S. 9:341."

La. R.S. 9:341(A) provides, in pertinent part:

> Whenever the court finds by a preponderance of the evidence that a parent has subjected any of his or her children or stepchildren to family violence, as defined in R.S. 9:362, or domestic abuse, as defined in R.S. 46:2132, has subjected any other household member, as defined in R.S. 2132, to a history of family violence as defined in R.S. 364(A), or has willingly permitted such abuse to any of his or her children or stepchildren despite having the ability to prevent it, the court shall allow only supervised visitation between the abusive parent and the abused child or children until such parent proves by a preponderance of the evidence at a contradictory hearing that the abusive parent has successfully completed a court-monitored domestic abuse intervention program, as defined in R.S. 9:362, since the last incident of domestic violence or family abuse.

Once the PSFVRA is triggered, the trial court need not look to the La. C.C. art. 134 factors relating to the best interest of the child until the perpetrator has satisfied all requirements delineated in the Act. *See Hicks v. Hicks*, 98-1527 (La. App. 3 Cir. 5/19/99), 733 So.2d 1261, 1266. La. C.C. art. 134(B) similarly provides that in cases involving a history of committing family violence as defined in the PSFVRA, whether or not a party has specifically sought relief under any applicable law, the court is to determine an award of custody or visitation in accordance with La. R.S. 9:341 and La. R.S. 9:364.

The actions of a parent may constitute family violence under the PSFVRA if they meet the statutory definition of "family violence" or "domestic abuse" and are evaluated within the discretion of the trial judge. La. R.S. 9:364(A); *see also Baker v. Perret*, 19-1162 (La. App. 1 Cir. 8/24/22), 349 So.3d 594, 601, n.6, *writ denied*, 22-1444 (La. 11/1/22), 349 So.3d 1. The PSFVRA defines "family violence" broadly to include physical or sexual abuse and any offense against the person as defined in the Louisiana Criminal Code, except negligent injuring and defamation. La. R.S. 9:362(4). A "history of family violence" can be established

by evidence of past events of family violence, and the statute does not require that the events be frequent or continuous. *Durand*, 366 So.3d at 490. Neither the provisions of the PSFVRA nor jurisprudence requires that relief under the PSFVRA be specifically pleaded, where the allegations of abuse have been raised in the pleading or tried by the express or implied consent of the parties. *Id.*; *see also Dufresne*, 992 So.2d at 583-587; *Nettles v. Nettles*, 13-1164 (La. App. 1 Cir. 2/27/13), 2013 WL 6858325, *2, n.2. Whether a parent's actions constitute family violence is a fact-intensive determination that requires the trial court to weigh evidence and consider the totality of the circumstances. *Simmons v. Simmons*, 26,414 (La. App. 2 Cir. 1/25/95), 649 So.2d 799, 802.

In deciding whether a parent has a "history of perpetrating family violence," the trial court should look at the entire chronicle of the family, remaining mindful that the paramount goal of the legislation is the children's best interest. The determination must be based on a review of the total circumstances of the family, and necessarily involves a weighing of the evidence. *See Short v. Burquera*, 24-555 (La. App. 5 Cir. 12/27/24), 2024 WL 5233092, *2.

Contrary to Mr. Thurman's contention, the PSFVRA does not explicitly limit the consideration of family violence to acts occurring within the current relationship. For example, in *Merrells v. Dotray*, 53,551 (La. App. 2 Cir. 7/8/20), 299 So.3d 208, noting that the PSFVRA specifically incorporates a person who has a history of "domestic abuse," as defined by La. R.S. 46:2132(3)—an act committed by one family member, household member, or dating partner against another—the appellate court considered acts of domestic abuse committed by the child's father against a prior dating partner in reaching its conclusion that the father had a history of perpetrating family violence.[6]

---

[6]    Louisiana Revised Statute 46:2131(3) defines "domestic abuse" in pertinent part as including, but not limited to, "physical or sexual abuse and any offense against the person, physical or non-physical, as defined in the Criminal Code of Louisiana, except negligent injury and defamation, committed by one

Also, in *Baker v. Perret*, *supra*, the trial court concluded that the father qualified as a perpetrator of domestic violence under the PSFVRA. In making its determination, the trial court considered evidence of violence perpetrated against not only the father's wife and one of her children that was not the perpetrator's biological child, but also against his former wife. *Baker*, 349 So.3d at 602-605.

Moreover, where there is more than one incident of domestic abuse or an offense against the person, those incidents do not have to produce serious bodily injury to be considered as part of a history of perpetrating family violence. *See* La. R.S. 9:364(A). In the instant matter, Ms. Marshall testified that she left the home where she was cohabitating with Mr. Thurman because of *many* acts of domestic violence. In addition to the September 3, 2023 incident of family violence that the trial court described in its written reasons for judgment, we find the record is replete with numerous acts of domestic abuse or family violence perpetrated by Mr. Thurman against Ms. Marshall.

Ms. Marshall described an incident that occurred on November 4, 2022, following an argument between Mr. Thurman and his parents. She was three months pregnant with R.T. Ms. Marshall stated that Mr. Thurman came home and began arguing with her that R.T. was "not my baby," when he got on top of her, grabbed her by the throat and began to choke her to the point that she feared he was going to kill her. She stated that once he let go of her, she went into the children's bedroom to gather some of their clothes and get the children out of the house and away from Mr. Thurman. She claimed that Mr. Thurman barged into the bedroom, punched his fist through her son's television and made a hole in the wall. Ms. Marshall testified that she ended up taking the children to a hotel that

_____

family member, household member, or dating partner against another." "Family members" are defined as spouses, former spouses, parents and children, stepparents, stepchildren, foster parents, and foster children. La. R.S. 46:2132(4). "Household members" are defined as "any person presently or formerly living in the same residence with the defendant and who is involved or has been involved in a sexual or intimate relationship with the defendant and who is seeking protection under this Part." *Id.*

night.  When questioned about the incident on cross-examination, Mr. Thurman stated that he "could not recall" the incident and denied that he had ever grabbed Ms. Marshall by the throat or ever choked her.

Ms. Marshall testified to another incident of family violence by Mr. Thurman that occurred on October 7, 2023, when she, Mr. Thurman, R.T., and her daughter and son had gone to the house of her friends in Mississippi to visit and eat gumbo.  She and Mr. Thurman both had "a few" drinks.  Ms. Marshall claimed that Mr. Thurman was getting increasingly aggravated with R.T. and screamed at him in front of everyone to "shut the 'F' up."  Later, on the ride home with the kids in the car, she and Mr. Thurman were arguing when her friend, who had allegedly been disturbed by Mr. Thurman's earlier outburst, called to make sure everything was okay.  According to Ms. Marshall, Mr. Thurman began to yell and scream at her friend, threatening to turn the car around and beat her up.  Ms. Marshall testified that Mr. Thurman also threatened "to run the car into a pole with me and all of the children and ... kill us all."  Ms. Marshall stated that when they returned home, she knew that if she or the children went inside, Mr. Thurman "would probably" hurt her or one of them, so she took the children to her parents' home for the night.  On cross-examination, when asked about the incident, Mr. Thurman did not deny that the incident happened, but testified, "I don't remember it . . . I don't remember what happened that day."

Ms. Marshall testified to another incident that happened in October 2023.  She stated that she and Mr. Thurman were in the bed and she was holding R.T., who was six months old.  She explained that Mr. Thurman got "pissed off" about something she said, grabbed a full cup of milk from the side of the bed, and threw it onto her and the baby, causing the baby to awake screaming.  She and the baby were both soaked in milk.  On cross-examination, Mr. Thurman stated that he "did not recall" the incident.

Ms. Marshall testified that on November 28, 2023, Mr. Thurman became enraged when he could not find an extra set of keys to his boat that had sunk that day. According to Ms. Marshall, he was ripping the drawers out of the cabinets, pulling out everything that was inside of them, and throwing it. She claims that, in the presence of the children, Mr. Thurman kicked the glass on the front of the oven and glass flew everywhere. Ms. Marshall testified that given the outburst and her need to protect the children, she grabbed the children and took them to Mr. Thurman's parents' home. On cross-examination, Mr. Thurman remembered being angry and kicking the glass, but could not recall the children being present or Ms. Marshall leaving the house and taking the children with her.

Ms. Marshall testified that the last act of domestic violence committed against her by Mr. Thurman, which provoked her to finally leave the home where they cohabited, occurred on May 10, 2024. Ms. Marshall recounted that on that date, after learning that his friend had committed suicide, Mr. Thurman became enraged and began verbally assaulting her while R.T. was sitting on her lap. During the incident, he punched a picture frame with his fist, shattering the glass and cutting himself, requiring stitches. Mr. Thurman admitted that this was not an isolated incident. A video recording of this incident was played at trial and this Court's review of that recording is disturbing, to say the least. In its written reasons for judgment, the trial court found that this incident provided further credibility to Ms. Marshall's allegations of abusive behavior by Mr. Thurman.

In addition to these incidents of family violence committed by Mr. Thurman upon Ms. Marshall, the record contains two incidents of domestic abuse that Mr. Thurman committed against Ms. Thurman's daughter, a "household member" under La. R.S. 46:2132(4), and one against his own father, a "family member" under La. R.S. 2132(4), all three of which can be considered in a determination of whether the PSFVRA applies. La. R.S. 9:364(A). As to Ms. Marshall's eleven-

year-old daughter, Ms. Marshall testified that on September 13, 2023, she was staying at her parents' home to assist with her grandmother, who was in hospice, and her daughter was staying at a friend's house. On this day, Ms. Marshall's daughter had stopped by the house with her friend to get some clothes and saw that Mr. Thurman's son was playing with some of her bodywash. When the daughter asked Mr. Thurman's son not to "mess with [her] stuff," she claimed that Mr. Thurman got mad and started screaming at her daughter. Mr. Thurman then grabbed the container, and "hummed" it at her daughter, causing her daughter's friend "to run out of the house and tell her dad," who was waiting outside, and her daughter to immediately leave the house because she was afraid.

Ms. Marshall testified that in February 2024, her daughter was having a sleepover with several of her friends and they were having a "nerf gun war" in the living room. Mr. Thurman was there, also playing the game. At some point, Ms. Marshall's daughter became upset because she claimed Mr. Thurman kept shooting her with the nerf gun in the upper body and she asked him to stop because he was hurting her. When he did not and shot her three or four more times, Ms. Marshall's daughter started to cry, and Ms. Marshall said they needed to stop the game. She claims Mr. Thurman got upset and accused Ms. Marshall's daughter of whining, not because she was getting hurt from being shot, but because she was not winning the game. Ms. Marshall testified that Mr. Thurman physically "grabbed" her daughter, "pulled her outside," and began "hollering" so close to her daughter's face that his spit was "flying all over" her daughter. Mr. Thurman admitted at trial that he took Ms. Marshall's daughter outside on the porch and began screaming and cursing at her, while her friends remained inside, to "teach her a lesson," but denied that he physically threatened her.

As to the domestic abuse towards his father, two video recordings taken by Ms. Marshall were admitted into evidence and played for the trial court.

According to Ms. Marshall, she retreated to another room with R.T. because she was afraid. Both recordings, which Mr. Thurman testified occurred on the same day, show an enraged Mr. Thurman heatedly cursing at his father using extremely vile language. When asked at trial whether he threw a wrench at his father during the heated exchange, Mr. Thurman did not deny the allegation, but merely stated that he "did not recall" throwing a wrench or "believe" that he threw anything. The trial court noted that during the presentation of the video recordings at trial, "Mr. Thurman looked visibly uncomfortable with his own behavior."

Mr. Thurman denies that he committed any act of family violence against R.T. resulting in serious injury that would trigger the PSFVRA. Even though the trial court did not specifically consider the burn to R.T.'s middle finger (caused by a hot curling iron) as an "act of family violence" committed by Mr. Thurman for purposes of triggering application of the PSFVRA, the incident did raise concerns regarding whether the minor child should be protected. While recognizing that accidents do happen, particularly with toddlers and small children, after reviewing the testimony and the graphic photos of the burn, we find that Mr. Thurman's rendition of how the "accident" occurred is simply not plausible or credible. It is hard to imagine that a child under two years of age would have touched the hot curling iron with only his middle finger, and not with the tip of the middle finger, but between the first and second joints of the middle finger. The blistering to R.T.'s finger was notably serious, and even in the most docile toddler, would have inarguably elicited a concomitant verbal—and likely memorable—response from the child. Mr. Thurman's contention that he merely "forgot" to tell Ms. Marshall about the "accident" is not only disturbing, it is not credible. We agree with the trial court that the incident certainly supports the concern that R.T. should be protected from his father at this time.

We give great deference to the trial court's findings in matters of credibility, as the district court is in the best position to evaluate the demeanor and mannerisms of the witnesses, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listeners understanding and belief in what is said. *Dufresne*, 992 So.2d at 585. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. *Id.* at 585-86. A district court's determination of domestic abuse is entitled to great weight and will not be disturbed on appeal absent a clear abuse of discretion. *Melancon*, 258 So.3d at 961; *Dufresne*, 992 So.2d at 586.

Based on our thorough review of the record, it is clear that the trial court properly considered the totality of the circumstances and assessed the credibility of all of the witnesses who testified at the trial of this matter. We find no abuse of discretion in the trial court's finding that Mr. Thurman has a history of perpetrating family violence and that the PSFVRA governs the determination of custody for R.T. Further, we hold that the PSFVRA is broad enough to include the assaultive and abusive behavior exhibited by Mr. Thurman and to protect R.T. from being further exposed to family violence or domestic abuse perpetrated by him.

## IV. Evidentiary Rulings

Mr. Thurman next argues that the trial court erred by admitting into evidence (a) the St. Bernard Sheriff's Office police report; (b) the Petition for Protection from Stalking filed in the 34th JDC for St. Bernard Parish by Andrew Aranda; (c) a lawsuit Mr. Thurman filed in the 34th JDC for St. Bernard Parish against Tyler Estopinal; and (d) an incomplete copy of a Petition for Protection from Abuse filed by Breanna Goodling in the 34th JDC for St. Bernard Parish against Mr. Thurman.

The appellate court must consider whether the particular evidentiary ruling complained of was erroneous, and if so, whether the error prejudiced the complainant's case, with reversal warranted only if the error prejudiced the complainant's case. *Willis v. Demelo*, 14-427 (La. App. 5 Cir. 10/15/14), 182 So.3d 57, 60. A child custody matter must be viewed within the context of its own particular set of facts, and a trial court's determination regarding what evidence is admissible for the trier of fact will not be overturned absent clear error. *Folse v. Folse*, 98-1976 (La. 6/29/99), 738 So.2d 1040.

To promote the paramount goal of reaching a decision that is in the best interest of the child, the legislature has expressly allowed for relaxed evidentiary rules in child custody cases. La. C.E. art. 1101(B) states:

> [I]n the following proceedings, the principles underlying this Code shall serve as guides to the admissibility of evidence. The specific exclusionary rules and other provisions, however, shall be applied only to the extent that they tend to promote the purposes of the proceeding.
>
> ***
>
> (2) Child custody cases.

The "relaxed evidentiary standard [is] ... used to advance the purposes of the custody proceeding" because "the Louisiana legislature has concluded that the best interests of children are not served by strict application of the rules of evidence." *S.L.B. v. C.E.B.*, 17-978 (La. App. 4 Cir. 7/27/18), 252 So.3d 950, 966, *writ denied*, 18-1442 (La. 11/20/18), 256 So.3d 992 (citing *Bowden v. Bowden*, 48,268 (La. App. 2 Cir. 5/15/13), 114 So.3d 1194, 1205). The Louisiana Supreme Court has held that the trial judge sits as a sort of fiduciary on behalf of the child, and must pursue actively that course of conduct which will be the greatest benefit to the child. *C.M.J. v. L.M.C.*, 156 So.3d at 28-29. As explained in *Folse*, where the Supreme Court specifically held that La. C.E. art. 1101(B) applies to cases governed by the PSFVRA, the focus of the PSFVRA is "not the innocence of the

parent, but the best interest and custody of the child." 738 So.2d at 1046. The

*Folse* Court further explained that, in such cases, a judge is permitted to "use the

rules of evidence as guides rather than blinders because the relaxed standard is

responsive to the circumstances" in which family violence occurs and is exposed.

*Id.* at 1047. The Supreme Court reasoned that this holding was consistent with the

legislative intent to promote the purposes of custody determinations and public

policy regarding the welfare of children. *Id.* Moreover, the Supreme Court held

that hearsay evidence, which would have otherwise been inadmissible evidence,

was admissible in a case brought under the PSFVRA. *Id.* at 1047-48; *see also*

*C.L.S. v. G.J.S.*, 05-1419 (La. App. 4 Cir. 3/7/07), 953 So.2d 1025, 1041. Further,

the admission of hearsay testimony or unauthenticated documentary evidence in a

child custody case is subject to the harmless error analysis on appeal. *Flowers v.*

*Tasker*, 24-690 (La. App. 1 Cir. 2/28/25), 407 So.3d 927, 941.

### a. The St. Bernard Parish Police Report

Mr. Thurman argues the trial court erred in admitting the police report

because it was inadmissible hearsay evidence and was not properly authenticated.

Specifically, he argues that no police officer testified at trial and the report was

admitted for the purpose of "proving the truth of the matters asserted therein."

According to Mr. Thurman, the police report had a "substantial effect on the

outcome of the case" as evidenced by the trial court's reference to the report in its

written reasons for judgment.[7]

Police reports are generally inadmissible, even in domestic matters, because

they are public records specifically excluded from the exceptions to the hearsay

---

[7]     We note that appellate courts review judgments, not reasons for judgment, even in child custody cases; oral or written reasons for judgment are merely an explication of the court's determination, and do not alter, amend, or affect the final judgment being appealed. *See State through Department of Children and Family Services Child Support Enforcement v. Knapp*, 16-979 (La. App. 4 Cir. 4/12/17), 216 So.3d 130, 146.

rule under La. C.E. art. 803(8)(b)(i). Here, the trial court's admission of the report in this case was error.

The party challenging the trial court's evidentiary ruling bears the burden of proving that the error had a substantial effect on the outcome of the case when compared to the record in its totality. If the error did not prejudice the complaining party, a reversal is not warranted. *Flowers*, 407 So.3d at 940. In *Flowers*, a child custody case, the trial court admitted into evidence, not only testimony regarding the child's medical treatment for alleged sexual abuse, but also two unauthenticated documentary exhibits. *Id.* at 941. While acknowledging this admission of the evidence appeared to be inadmissible, the appellate court noted that "in the context of child custody cases, where the best interest of the child standard is the fundamental inquiry, the legislature has expressly allowed for relaxed evidentiary rules," and "the admission of hearsay testimony or unauthenticated documentary evidence is subject to the harmless error analysis on appeal, stating that "[g]enerally, the admission of hearsay evidence that is merely cumulative or corroborative of other evidence is held to be harmless error." *Id.* Concluding that the inadmissible evidence was merely cumulative or corroborative of other evidence introduced at trial, and did not have a substantial effect on the outcome of the case when compared to the totality of the record, the court held that the erroneous admission of the inadmissible evidence was harmless. *Id.* at 941.

In the instant case, the record shows that Mr. Thurman testified regarding the events that occurred on September 3, 2023, which were documented in the police report at issue. He stated that the parties attended a concert, where they both consumed alcohol, and were arguing on their way home. He testified that once they arrived home, Ms. Marshall went into her daughter's bedroom and locked the door. He later denied that the door could be locked from the inside. He admitted to going into the bedroom and, in anger, punched a hole in the wall. As for Ms.

Marshall's rendition of the incident, she testified that she and Mr. Thurman went to a concert, where they had been drinking and arguing, and that when they returned home, she went into her daughter's bedroom and locked the door. She stated that Mr. Thurman then busted through the door, knocking it off of its hinges, punched a hole in the wall, grabbed her and pulled her through the hallway, threw her onto the sofa, got on top of her, and then began choking her. Ms. Marshall testified that when she called 911, she reported strangulation, but when the officers arrived, she denied Mr. Thurman choked her because of her fear that they would both be brought to jail, leaving no one to care for her children.

Upon review, considering the cumulative nature of the evidence, and that the rules of evidence are relaxed in custody cases, we find that any error in the trial court's admission of the police report was harmless because it was merely cumulative and corroborative of other admissible evidence adduced at trial, including Mr. Thurman's own testimony regarding the events contained in the report. *Flowers*, 407 So.3d at 941; s*ee also State v. Maize*, 16-575 (La. App. 5 Cir. 6/15/17), 223 So.3d 633, 653, *writ denied*, 17-1265 (La. 4/27/18), 241 So.3d 306; and *State v. Jenkins*, 22-443 (La. App. 5 Cir. 2/27/23), 359 So.3d 1006, 1014.

Moreover, we find that Mr. Thurman has failed to show that the police report had a substantial effect on the outcome of this case when compared to the totality of the record. A review of the trial court's written reasons for judgment suggests that the only impact the report actually had was to corroborate Ms. Marshall's version of what occurred on September 3, 2023, and to extrinsically impeach Mr. Thurman's credibility. Specifically, the trial court stated that, "[w]hile Mr. Thurman denied this incident occurred *as testified to by Ms. Marshall*, the police report noted that [the officer] observed the door was off the hinges. Mr. Thurman admitted the parties argued with each other after they left the concert, and he punched the wall, *but denied the other events as testified to by Ms.*

*Marshall. . . . Ms. Marshall's version of events is **corroborated** by the report introduced, in that the officer was able to observe the door off of the hinges, and noted same. In considering the demeanor in testifying, the Court finds **Ms. Marshall's version of the story to be more credible**, and supported by other evidence, and the facts in this case."* [Emphasis supplied.] For these reasons, we find any error regarding the trial court's admission of the police report was harmless.

### b. Andrew Aranda's Petition from Stalking

At trial, a certified copy of a Petition for Protection from Stalking was filed against Mr. Thurman by Andrew Aranda, the ex-husband of Amber Aranda, a former dating partner of Mr. Thurman. Mr. Aranda testified that he filed the petition following an abusive encounter with Mr. Thurman, where Mr. Thurman physically threatened him in front of Amber and their children, although Mr. Thurman did not touch him. At trial, Mr. Thurman objected to the admission of the petition on grounds of relevancy and that doing so constituted an expansion of the pleadings. The trial court overruled his objection, citing *Melancon v. Russell*, *supra*, and stating the "PSFVRA is controlling and therefore it's important for this Court to hear this testimony."

First, the trial court expressly stated that it was not giving the petition itself much weight—establishing that admission of the evidence did not significantly impact the trial court's decision—but rather, found that the numerous acts of domestic violence committed by Mr. Thurman, as outlined in detail *supra*, is what triggered the custody and visitation restrictions of the PSFVRA. Further, we find the petition was merely cumulative and corroborative of Mr. Aranda's trial testimony and other admissible evidence. Thus, to the extent that the trial court committed error by admitting into evidence Mr. Aranda's petition for protection filed against Mr. Thurman, such error was harmless.

### c. Lawsuit Filed by Tyler Estopinal

Mr. Thurman argues the trial court improperly admitted evidence pertaining to an unrelated lawsuit he filed against his neighbor, Tyler Estopinal, over his counsel's objections that admitting the evidence was an expansion of Ms. Marshall's pleadings, the evidence was irrelevant, and the precedential value of the evidence was outweighed by its prejudicial effect under La. C.E. arts. 403[8] and 404(B).[9] The trial court overruled Mr. Thurman's objection, citing the relaxed evidentiary standards applicable to the well-being of the child, the first of which is "the propensity for violence."

In response, Ms. Marshall noted that, during the proceedings, the trial court made clear that it was giving no weight to the evidence pertaining to Mr. Estopinal, other than being persuaded by the judgment rendered by the trial judge in the case, wherein Mr. Estopinal was found to have a "fear" of Mr. Thurman. Ms. Marshall avers the judgment is self-authenticating and falls under La. C.E. art. 803(a)(i), an exception to the hearsay rule that allows for admission of records of public offices or agencies setting forth its regularly conducted and regularly recorded activities.

While these articles generally govern the admissibly of evidence, child custody cases are subject to a "relaxed evidentiary standard" under La. C.E. art. 1101(B)(2). As previously stated, this standard allows the principles underlying the Code of Evidence to serve as guides, but the specific evidentiary rules (such as articles 404(B) and 403) are applied only to the extent that they promote the purposes of the custody proceeding. The overarching goal in child custody cases is

---

[8] Louisiana Code of Evidence Article 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."

[9] Louisiana Code of Evidence Article 404(B)(1)(a) provides, in pertinent part, that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith."

to determine the best interest of the child, which often necessitates a more flexible approach to the admissibility of evidence.

In this case, we find that to the extent admission of the evidence pertaining to Tyler Estopinal's lawsuit against Mr. Thurman constituted error, considering the relaxed evidentiary standards in child custody cases, the error was harmless. Further, given the trial court's statement that she was giving no weight to the evidence other than to the trial court's judgment, Mr. Thurman has failed to show that admission of the evidence substantially affected the outcome of this case or that the precedential value of the evidence was outweighed by its prejudicial effect. This assignment of error lacks merit.

### d. The Petition for Protection from Abuse filed by Breanna Goodling

Mr. Thurman next argues the trial court erroneously admitted into evidence a Petition for Protection from Abuse filed against him by Breanna Goodling, a former girlfriend, over the objection of his counsel. Mr. Thurman argues that because the petition admitted into evidence was an "incomplete copy" of the petition Ms. Goodling actually filed, as it did not contain an Order of Protection indicating the disposition of the petition, the petition admitted was not a "certified copy and, thus, was not self-authenticating." Mr. Thurman also objected to the admission of the Petition on grounds that doing so was an improper expansion of Ms. Marshall's custody petition as she had not pled the PSFVRA nor alleged a history of family violence. Further, Mr. Thurman argues Ms. Goodling's Petition has no relevance to the instant case and was improperly used by Ms. Marshall in order to cast him in a bad light and to suggest that the mere filing of the prior Petition for Abuse must mean that he is guilty of abuse in this case.

The record reflects the trial court found that the trial testimony of Ms. Goodling "lacked all credibility." There is no indication whatsoever that the trial court gave any weight to Ms. Goodling's testimony, or considered the allegations

contained in her Petition, in reaching its conclusion that Mr. Thurman had a history of perpetrating family violence and that the PSFVRA applied in this case. Therefore, once again considering the relaxed evidentiary standards in child custody cases, we find Mr. Thurman failed to show that the trial court's admission of this evidence was erroneous. Further, we find that even if the evidence was inadmissible, Mr. Thurman has failed to carry his burden of proving that the admission of this evidence substantially affected the trial court's conclusion that Mr. Thurman was a perpetrator of family violence and that his actions triggered application of the PSFVRA in this case.

**V.     Grant of Sole Custody in Favor of Ms. Marshall**

Mr. Thurman argues the trial court abused its discretion in awarding sole custody of R.T. to Ms. Marshall under the admissible evidence in this case. Based on our review of the totality of the admissible evidence in this case, we disagree.

According to Mr. Thurman, Louisiana continues to favor joint custody of minor children, and sole custody is only awarded if clear and convincing evidence shows that it is in the best interest of the child for one parent to have sole custody. He urges that the domestic hearing officer, even though he heard the evidence of the May 10, 2024 incident, where Mr. Thurman yelled and screamed curse words at Ms. Marshall resulting in the parties' breakup, still awarded joint custody of R.T. to the parties, with them sharing approximately equal physical custody of the minor child. Mr. Thurman avers that the parties disagreed regarding whether Ms. Marshall should get sole custody because "Mr. Thurman yelled curse words at her." He claims that had an issue of domestic violence actually been placed at issue before the court, the case would not—and could not—have gone to the domestic hearing officer, but rather, would have gone to the domestic commissioner. Mr. Thurman contends that the single, admissible incident of alleged violence in this case—the May 10, 2024 video of him screaming—and the

testimony related to that incident, did not amount to clear and convincing evidence that sole custody in favor of Ms. Thurman was in the best interest of R.T. We disagree.

A trial court's determination in child custody case will not be disturbed on appeal unless there is a clear abuse of discretion. *Pierre v. Pierre*, 23-470 (La. App. 5 Cir. 2/21/24), 383 So.3d 1028, 1035; *Obi v. Onunkwo*, 23-116 (La. App. 5 Cir. 12/6/23), 378 So.3d 812, 817-18. Additionally, it is well-settled that an appellate court cannot set aside the trial court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. *Id.*; *Bordelon v. Thiele*, 23-336 (La. App. 5 Cir. 12/27/23), 379 So.3d 804, 815.

For all of the reasons previously stated herein, including admissible evidence of the numerous incidents of domestic violence perpetrated by Mr. Thurman against Ms. Marshall and others that are delineated in detail *supra*, we find that Ms. Marshall established by clear and convincing evidence that Mr. Thurman had a history of perpetrating family violence, thereby triggering application of the PSFVRA, and invoking the presumption that he could not be awarded joint custody or unsupervised visitation. This assignment of error is without merit.

## CONCLUSION

Based on our review of the record, and given the deference owed to the trial court in its factual findings and credibility determinations below, we find the trial court's determination that the PSFVRA is applicable is overwhelmingly supported by the testimony and evidence. Thus, we find no abuse of discretion in the trial court's award of sole custody of R.T. to Ms. Marshall with supervised visitation to Mr. Thurman.

**MS. MARSHALL'S ANSWER TO MR. THURMAN'S APPEAL**

In her answer to the appeal, Ms. Marshall seeks an award of "all damages, including those pursuant to the [PSFVRA] . . ., attorney's fees for frivolous appeal,

as well as costs as permitted under [La. C.C. arts.] 863 and 2164 and any other legal provision that supports an award for fees and costs related to an appeal." La. R.S. 9:367 provides that attorney's fees and costs necessitated by the family violence be paid by the party responsible for the family violence. While we find the trial court did not err in finding Mr. Thurman committed acts of domestic violence that triggered the PSFVRA, we are unable to determine from the record which attorney's fees and costs were incurred or necessitated by this violence. Accordingly, we find that Ms. Marshall is entitled to costs and attorney's fees in accordance with La. R.S. 9:367, but we must remand the matter to the trial court for a proper determination of the amount of attorney's fees and costs incurred by Ms. Marshall as a result of the domestic violence perpetrated by Mr. Thurman.

## DECREE

For the foregoing reasons, we affirm the judgment of the trial court, but remand the matter for a determination of the issue of attorney's fees and costs.

**JUDGMENT AFFIRMED;**
**REMANDED WITH INSTRUCTIONS**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. TRAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



**FIFTH CIRCUIT**

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **SEPTEMBER 24, 2025** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**25-CA-309**

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE SHAYNA BEEVERS MORVANT (DISTRICT JUDGE)
CYNTHIA A. DE LUCA (APPELLANT)          MARYNELL L. PIGLIA (APPELLANT)          CHRISTINE F. REMY (APPELLEE)

**MAILED**
JULIUS C. FORD (APPELLANT)
ATTORNEY AT LAW
7037 CANAL BOULEVARD
SUITE 204
NEW ORLEANS, LA 70124